The next case is Lisotto v. New Prime Incorporated. Ms. Fulmer, when you're ready. Thank you, Your Honor, and may it please the Court. I'm Rebecca Fulmer, counsel for Appellant John Lisotto. After much deliberation, it appears that there is a single question that is dispositive of the central issue in this appeal. And that question is the legal status of Prime's medical review officer, MRO, Dr. Malden. I'm prepared to go over the facts if Your Honors would like. Why does that status matter in our decision, do you think? I would like to be as helpful as I can to Your Honors in showing why. And I can refer to the joint... No, I'm just asking, why does his status matter? His status matters because if he is not a medical examiner, otherwise known as a DOT physician, he's not qualified to render a position on a driver's physical qualifications for what's called a medical examiner's certificate, otherwise known as a DOT card. So you therefore think the regulations don't click in as to the submission to the highway board? Exactly, because the regulations that govern the MRO and the verification process, that is determining whether there's a legitimate explanation for a substance that is banned and appears in the urine screen, then... You think the work of the MRO is limited to deciding whether or not the drug test was valid, and that is all antecedent to getting into whether or not the driver is qualified or not qualified, and if there's some conflict, how that's resolved under that regulation. Almost exactly, Your Honor. I wouldn't say antecedent necessarily, just separate and distinct. Well, it's certainly antecedent in this case, because the reason he was disqualified was because of the drug test. The reason that Prime gave Mr. Lesoto for not employing him was because he tested positive for amphetamines. That's what I'm saying. That's true, Your Honor. It absolutely is antecedent to the other regulations, 139. Maybe I'm misunderstanding. The drug test determination is a matter that comes before the administrative remedy through that. Oh, yes, certainly. It certainly comes before an administrative remedy, because there has to be a decision by the DOT physician, and in this case, Dr. Abraham disqualified Mr. Lesoto temporarily because the company would not accept dexedrine to treat narcolepsy. What do you make of the fact? Do you think that Prime thought that narcolepsy was absolutely a disqualifier, no matter what? No, I do not. Why is that so? Why is your answer correct under these facts? Under the facts alleged? Because the sequence of events was that Mr. Lesoto presented himself to the clinic. He saw the nurse and the doctor. He gave the nurse and the doctor his medication and a letter from his physician. When I say the doctor, I'm referring to Prime's DOT physician. I know, but just answer my question. Why do you think that Prime did not, on the facts alleged in the complaint, why do you think that Prime did not consider narcolepsy to be an absolutely disqualifying condition? For two reasons. Okay. First of all, as alleged, Prime was told after he changed his medication and came back, he called the recruiter. The recruiter, he said, well. Why don't you go ahead and finish your answer. I think you were on what I think is correct. Finish your answer. Because didn't he indicate to him, change your medication and then come back to us? Absolutely. Absolutely. And when he came back. Doesn't that suggest that Prime, at least the inference of those facts, that Prime didn't suggest that narcolepsy was disqualified? Absolutely, Your Honor. It did not, this could not have disqualified Mr. Lesoto on account of narcolepsy because the DO physician said change your medication. No, no, no. I don't know about that now. To say that they could not disqualify him, that maybe they could have, but they didn't say it was going to be an automatic. Isn't that fair? Yeah, I mean. But they did tell him to come back. Exactly. By could have, I mean under the facts. They said change your medication to provigil, then come back. What are we to do with the fact that the other regulation, as I looked at it, and I don't have the numbers in front of me, what a medical review officer is to give five days, you know, to allow five days. What are we to make of the fact here that the medical review officer didn't effectively give five days because he wouldn't take a phone call or wouldn't talk to Mr. Lesoto's doctor in those times? What do we do with that? What I think we do with that is admit that that was a failure of the MRO to provide a legitimate and effective opportunity for Mr. Lesoto to prove his legitimate medical explanation. That's a failure on the part of Prime Incorporated. Well, it is, Your Honor, because under the regulations, the employer, the motor carrier is responsible for the delics and the actions of its service providers, including MROs. And I've briefed that, but that's another extended complicated issue. But, yes, sir, the mistakes of the MRO are attributable to Prime. What I was going to do, Your Honor, and maybe it's not necessary at this point, I wanted to point to the record, trying to be as orderly as possible, the joint appendix, page 104. And at the bottom of that page, this is a ruling on plaintiff's Rule 59e motion, the district court says that certain allegations of the complaint that I will get to in just a moment, in the court's opinion, frame what, in the court's view, is a conflict of medical opinion or disagreement between two individuals, the court says, who are indisputably physicians as to the plaintiff's qualifications to serve as a driver. That is simply wrong. You think that the court below made a mistake by reading 391.47, the word physician there, too broadly. Way too broadly. And the reason why. Well, it's broadly enough to include the MRO. You say that's not included under the regulations, and even if it were, that any regulations about the medical review officer do not give that doctor the authority to make any judgment on qualification for the job. Neither sets of regulations. I see things rather visually, so I'll put. Don't do it. I'll put Part 40 over there and Part 391 over here. Part 40 is a DOT regulation. Part 391, which includes the provision we're examining here today for conflict resolution, is in the set of statutes promulgated by the Federal Motor Carrier Safety Administration. Part 40 is not. And within the Federal Motor Carrier Safety regulations are the regulations that govern what a driver has to meet in order to be physically qualified for a medical examiner's certificate. And that's where we find this conflict of medical resolution provision. Does it say physically qualified, or does it say qualified? Do you know? I do know. And may I? Again, it helps me to refer to the records. It just helps us for you to answer. I'm doing my best, Your Honor. If you look at Section 391.47, B2, that is the provision that says there must be a disagreement between a physician for the driver and the physician for the motor carrier concerning the driver's qualifications. But that Section B2 comes after A. And A says applications for determination of a driver's medical qualifications under the standards of this part, which is Part 391. And Part 391 governs physical qualifications and examinations of drivers. And, Your Honor, there is not a single case that Prime has cited or that was relied upon by the magistrate judge or by the court that actually looked at a determination by a medical review officer. The Harris case that seems so importantly relied upon by everybody did not involve an MRO. It involved it. Yes, Your Honor. Let me just ask a question about the MRO physician thing. I totally understand your argument on that point. But even if, just assuming hypothetically, you were to say that the MRO was a physician, I mean, isn't it still the case that there was no dispute as to medical qualifications at the relevant time in this case? Even if he were a doctor who could put medical qualifications into dispute,  Exactly, Your Honor. So even if you put that to one side, let's assume, I mean, at the time that they decided not to hire him, he had not yet said, I have this problem about narcolepsy, right? Yes, Your Honor. On the date of the adverse employment decision, which was in early November, when Mr. Lesoto called back and said, I've done what you said. I'm ready to come to work. And the lady in the personnel office says, Why are you calling? You can't come. You tested positive for amphetamines. That was the only thing that Prime was aware of at the time of that adverse employment decision. Is it Dr. Malden? Am I remembering that right? Does he ever talk to Prime about his narcolepsy? No, Your Honor. And that is the second very, very important point. The MRO left. We've discovered this because we have now had discovery in related state law claims. The magistrate judge denied the motion to amend the complaint in the ADA action with permission to file in state court. So we are in the process of discovery there. We have actually deposed Dr. Malden and Dr. Abraham. Why don't you just tell us what you found? Well, what we've found a lot of things, Your Honor. But on this question. That's all that helps your argument. On this question, yes. The MRO was not available because he had left employment with, I think it was Concerta, the company he was working with, and had gone off on his own. When did he leave? About October 1st. So he was giving Mr. Lesoto a number to call that wasn't going to work. And that didn't happen. And I guess I should mention this, Your Honor. I don't know if it's necessary. I and my co-counsel deliberated strongly about this. But we now have absolute proof of facts, the testimony of both. Now, wait one second. Is this in the record in this case? No, Your Honor. What I was going to say is I've prepared a motion to supplement the record. I don't know that it's necessary to do this. But if I did, it would be to show that the deposition testimony of DOT's physician and DOT's medical review officer confirm exactly the allegations in the complaint. And the medical review officer admits it was not up to him to opine on Mr. Lesoto's qualifications to drive, that that was the role of the DOT physician, Dr. Abraham. And opposing counsel is aware of this. I had asked. We've just gotten the transcripts in recently. And I asked if his client would agree to supplement the record. And they would not. But there's grounds for it, particularly because one basis of Prime's motion to dismiss was lack of subject matter jurisdiction under Rule 12b-1. That wasn't argued heavily. It was the 12b-6 motion that was argued heavily. But as I understand it, the court may consider matters outside the allegations of the pleadings in determining whether the court has jurisdiction. I just wanted to mention that that exists. Well, if you decide to make that motion, then you can make that motion. Well, I'd like to do it now, then. No, hand it to him, and then we'll just take it under advisement. We'll just take it under advisement. We'll take it under advisement. Thank you very much. Now, your time has run out for your presentation in the first instance. All right. But you reserve some time. Yes, sir. Okay. Thank you, Your Honor. Thank you very much. Thank you. Mr. Belcher, glad to hear from you. Good morning. My name is Reggie Belcher. I am a lawyer from Columbia, South Carolina, and our law firm represents Prime, Inc., the appellee, and we respectfully ask the court to affirm the dismissal of the case from the lower court. This is not a typical ADA case that involves an employer's obligations versus what is typically an individual plaintiff or employee. This case involves significant matters of public safety, which outweigh and supersede whatever rights Mr. Misoto had. Your client didn't think that narcolepsy is absolutely a disqualifier, correct? No, that's not true, apparently. No, that's apparently not true. What is apparently? Well . . . Let me ask you another way. Based on the actions of your client's employee, the nurse, through the nurse, they conveyed to Mr. Misoto that it wasn't absolutely a disqualifier, correct? He could get an exception if he went through the Federal Motor Carrier Safety Administration. So there are exceptions. There are exceptions. Wait a minute. The inference when the nurse goes, change your medication, have your doctor change your medication, and come back and see us, and I think it was six weeks, I can't remember exactly, see us in six weeks, you think the inference is because you might qualify for an exception? Or is the inference that you would then qualify under the proper medication for us, for us to accept you? Why isn't Mr. Misoto entitled to the second inference? He may be. He may be. Not maybe. Why isn't he under these facts? Paragraph 24 of the complaint also says that Prime told Mr. Misoto, you tested positive for amphetamine, so you can't work here anymore. I know that, but that was after the fact. I'm talking about on the day that they were told, they didn't say you would disqualify because of narcolepsy. Now, we can dance around all day if you want to, but it's your position that the statement from the nurse is unqualifiedly that a narcoleptic, under any circumstances, may not work for this company. That's not your position, is it? No. That's not my position. Because he could qualify under an exception, but he would have to go through the FMSCA. Let's just walk back through that for a second. It's your position that when the nurse says, I want you to think about this now, this is the first line of questioning, that when the nurse says to somebody applying for a job, we have this note from your doctor, you have to take a different kind of medicine if you're a narcoleptic. Take that and then come back and see us. You're saying the inference is she, what the inference is, because then you might qualify for an exception. That's right. They'll reevaluate then. That we will take you. That they would reevaluate. Why don't you let me finish? Yes, Judge. Excuse me. That's not an inference that if you come back then with the changed medication, we would employ you. Exception or not, we would employ you. Could employ you. I disagree with that. Could employ you. I disagree with that. Well, I think I would say based on any kind of inference, you would likely be wrong on that. But we don't have to get to that inference because the step before that is that Dr. Abraham. We have to get to that inference because I asked you the question. Now, if you want to make a theory or make some argument while we don't get there, then I'll be glad to let you argue that. Go ahead and argue that if you want to. Dr. Abraham, the examining physician, never medically certified Mr. Lesoto, and that makes him disqualified under the ADA because under the ADA you have to be a qualified individual, and we've cited a number of cases that say you can't be a qualified individual under the ADA to be a truck driver. Wait, wait, wait. In deciding if you're a qualified individual, does Prime have to follow the regulations that are applicable to it? Yes. Including the medical review officer? Yes. Did you follow those? Yes. And you gave five days? Yes. Under these facts, you gave five days for a response to the test results? I think so, Judge. The testimony or the evidence or the allegations are you never responded to his doctor trying to bring that information to you. Judge, I think we've also got to go back and revisit the applicable regulation on MROs. This was overlooked in the opening argument that Dr. Maldon as an MRO couldn't opine on the narcolepsy issue. I didn't ask you that. I didn't ask you that. If you've read it, and I have, it has a provision about you give five days for a response to explain, and you say you did live up to that obligation. I'll defer to whatever the complaint says, Judge. Because that's what we're basing it on. Let me just say this. Have you read the complaint? Yes, Judge. Okay. But you can't remember what it says? I'll agree with you, Judge, on that. I don't know what you're saying. So you did or did not? Based on the allegations in the complaint. That's all we have. I'm not saying what you're saying. It's a motion to dismiss. Yes. It's based on the allegation. I'm not saying what the facts are. We don't know that. We don't have to know at this point. But the allegations of the complaint is that Dr. Maldon did not give him five days notice. And that does not defeat Prime's argument on this appeal. Because throughout... So why do you think the effect of not giving notice to explain away what is otherwise a positive drug test, that just doesn't matter? He ultimately did explain the reasons to Dr. Maldon in a letter, and it may not have been with that five-day period. But ultimately, Dr. Maldon didn't agree with it anyway. He didn't agree with it because under the FMSCA's guidelines, narcolepsy is a disqualifying condition and treatment through amphetamines is ineffective. And so Dr. Maldon didn't have to agree with Dr. Krug. Put it to one side for a minute, the narcolepsy thing, right? He's supposed to change the test result. This guy now has a positive drug test in his record. He's not supposed to have one. I mean, that's going to follow him forever, right? Putting to one side the narcolepsy, whether he can drive, the regulations make really clear if you have a prescription medication and that's why you're testing positive, they're supposed to say that's a negative drug test, and he didn't do that. At that point in time, Dr. Maldon did not change the drug test from positive to negative. But the regulations say he doesn't have to. It's at his discretion. And Dr. Maldon decided not to. And Dr. Maldon's letter said, and besides, you have narcolepsy, which is a disqualifying condition, which is correct. At that point in time, even though Dr. Maldon didn't change the drug test result, Mr. Lesoto is still not a qualified individual under the ADA and still doesn't have a viable ADA claim. And he doesn't have one. Why is it that Prime, when he called back, why would Prime, when he called back at Prime's instruction, I'm talking about Mr. Lesoto, they said to him, what, we can't hire you because you're narcoleptic or we can't hire you because your drug test, you failed your drug test. Which was it? Either would be a disqualifying condition. I didn't ask you that. They said the drug test. Right. So let me just understand your argument. Your argument is that based on these facts that we have before us, the allegations, that Prime did not follow properly the word of the M medical review officer's regulations, correct, on the five days, correct? Correct. And that the test result was then reported as a positive drug test, and that's the reason he was denied the job. That's what he was told by Prime. He was denied the judge job because he never had a medical certification. Yeah. Excuse me? You've got your words backwards. Excuse me. You said he was denied the judge job. Excuse me. He was denied the job because he never had a medical certification. You can't be an over-the-road truck driver without the medical certification. I know that, but how do you get one if the company blocks it on information that's given when the regulations aren't following? He could go to the, he could file a complaint with the Federal Motor Carrier Safety Administration, which was what he was supposed to do. Is that why you didn't follow the MRO position? They didn't follow the regs on the medical drawings? No, he should have done that first. When Dr. Abraham didn't certify him, that was the first time. Dr. Abraham didn't certify him because he tested positive for amphetamines. At that point, Mr. Lesoto knew. Mr. Lesoto knew that he tested positive because he had been diagnosed with narcolepsy. It was at that point that he didn't get his medical certification, and it was at that point he should have complained to the FMCSA. Further on, when we get to the point. I think you have us puzzled. All right, there were two. Your position is, despite the fact that regulations allow for him to challenge, first of all, the man comes in with an explanation for why he made tests, that he's taking medications, and that could affect the drug test. Then the regulation says if you do test positive under a drug test initially, you have a right to challenge that or explain it in five days. That was not followed. Then that regulation not being followed led to a failed drug test being reported, and the company bootstraps on that and goes, you can't be hired because you have a failed drug test, and by the way, it is transmitted to other people. And your argument is he should have filed a complaint or gone to the motor carrier folks much earlier in the process than even the drug test? No, he should have gone when he failed the drug test. He took the drug test. Wait a minute. Hang on a second. Excuse me, excuse me. Not the drug test. He goes and he has a physical examination with Dr. Abraham. Dr. Abraham does not give him the medical certification he needs. There is no disagreement. At that point, his doctor agrees with Dr. Abraham. We're all good here. He's going to switch his medication. He's going to come back in six weeks. And he still didn't have it, but he still didn't have a medical certification. Wait, no, listen. I know you're anticipating, but you may not be anticipating correctly. Let her finish the question. There's no disagreement at that point. So what's he supposed to come forward with? Everybody is in agreement about the course of action. He's going to switch his medication. He's going to be whatever it is, stable on it for six weeks. He's going to come back. Why would he file anything? Everybody is in agreement. He needed to file with the government, with the administrative agency, because he still didn't receive. There's no medical disagreement. The procedure you're talking about is a procedure to resolve a medical disagreement. There is literally no medical disagreement. Two doctors have examined him. They agree on the course of action. What's he supposed to file? What's to resolve? The resolution, or he needed to resolve the fact that Dr. Abraham still didn't give him the medical certification. But the process isn't completed yet. The MRO process, as opposing counsel noted, is a separate process from this physical examination at the beginning. But he's not going to get certified. Judge Harris points out, which is how I read the record too, and I bet Judge Thacker read it the same way. There's not any dispute at that point. Everybody is in agreement. He is being treated for narcolepsy. Poor man, it turns out he doesn't even have narcolepsy. But he's being treated for narcolepsy, and that's why I'm telling everybody I'm taking medications given from my doctor. And everybody agrees at that point, we're not certifying you yet because we can't certify you over taking that medicine, the kind of medicine you're taking. Change it, come back and see us, and the implication is, and then we'll continue on, and that won't be a problem. Maybe other things would be. I don't know. But it's almost like an interlocutory appeal, what you're talking about. The matter hadn't been decided yet, and it only gets decided when there is a failure to follow the regulations, and then that justification on the drug test failure is what's used to say no to him. And you think, where is the medical dispute or conflict to be resolved? Judge Harris pointed it out. Everybody is in agreement. Everybody appears to be in agreement. I'm just putting a rough rub on this until he calls and goes, okay, my time has run. I'm ready to come see you. And the company goes, can't see you. You failed your drug test. The company apparently changed its mind, which was its prerogative to do so. They can't hire him because he failed his drug test. They didn't change his mind about his medical qualifications. And I want to go back to, and maybe I'm looking at the wrong regulation, but the one I'm looking at says that if there's a legitimate medical explanation, the MRO must verify the test result as negative. And the MRO didn't do that. And now this guy has a, I mean, this is like having a positive drug test in your record. That's devastating. Here's the point I'm making on that. He's alleged a number of other claims in his other lawsuit against Prime. Defamation, unfair trade practices, negligence. Seems like there's a fourth. Sounds like you may have some basis. But he has, if he has a remedy based on something that Prime might have not done correctly with the drug test, it's on one of those. It's not under the ADA. It's not under the ADA because at no time did he ever get the medical certification. But you can have a number of causes of action. You can have a defamation action that doesn't fit under some regulation. He can, Judge. But my point is this. He has no remedy under the ADA. Are you defending, then, the judgment below, which was that he failed to exhaust? The judgment below didn't turn on whether or not he had an ADA claim. They just said he needed to exhaust. Are you defending that or are you agreeing there was no ADA? No, he failed to exhaust. He needed to go to the administrative agency and work these issues out there. That's a separate argument from what you're talking about now, about whether ultimately he wins or loses on his ADA claim. That's right. Ultimately, he's never at any point in this lawsuit been a qualified individual under the ADA because he never got the medical certification. He had narcolepsy and he tested positive for amphetamines. I'm asking you to talk about the exhaustion claim that's really in front of us rather than going to the merits of the ADA claim because that seems like something for another day. Well, we raised it at the district court level. We've raised it throughout the lawsuit. But on the exhaustion claim, there's no case that says that an MRO can't opine on a medical issue, and that's what Dr. Malden did. And, in fact, in 49 CFR 4137. Is there a case that says that an MRO can? As appellant's counsel pointed out, you have no case or law or regulation or anything to say that. We've cited to a lot of cases where nurse clinicians and nurse practitioners opined on a medical issue. In the Harris versus Pam transport case that we cited from the Eighth Circuit may not have been the MRO, but it was someone from the medical review office that opined. You're right. It wasn't an MRO. It was a physician in Harris. From the medical review office. A physician. And, again, I was pointing the court to 49 CFR 4137, and this is the regulation that deals with MROs, and it deals with what basis does the MRO verify test results involving amphetamines. And the fourth section there says, even if you find that there's a legitimate medical explanation and verify test negative, you may have a responsibility to raise fitness for duty considerations with the employer. So the regulation, the MRO regulation. Did he ever raise this with the employer? Can you point to anything in the record that shows that the MRO raised with Prime this concern about narcolepsy? Because you just told me he might have a duty to do that, but it doesn't look like he did. All he did was two months late tell the guy, well, whatever, I'm not changing your test results. Whether he did or not, Prime already knew that he had narcolepsy from Dr. Abraham's. I'm talking about what you just said, which was that he might have this duty to, but there's no record evidence that he did that. No, I'm not aware of any. But Prime already knew that he suffered from narcolepsy based on his examination with Dr. Abraham. Is it concerning to you that you seem to see the law and the facts differently than everybody else in this discussion? I'm not being smart, I'm just asking you. Because I want to understand maybe, what do you think, in a nutshell, that maybe I might be missing? In a nutshell? You know, just in a nutshell, what do I have wrong? In a nutshell, the safety administration gives great discretion to the employer to make these decisions, because ultimately it's up to the employer to determine who's safe enough to put out on the highway. As a general rule, but there are ways that the government has said you have discretion, but it's not unfettered and you're to do these things. What here factually or legally do you think, for my questions, maybe I don't understand about your argument? I'm simply saying that if he had a position that showed that he was safe enough to be on the highway, that argument shouldn't be at a federal district court in Columbia or at the Fourth Circuit in Richmond. It should be before a review panel with the Federal Motor Carrier Safety Administration. What happens, and why do you think the basis for Prime rejecting him is narcolepsy or that drug test? I think it's both. Both are disqualifying conditions. Both. And we've cited to the policy positions. Let me ask you this much. Yes. Why didn't Prime say that to him when he walked in with his note and said, you have narcolepsy, no matter what you take, it doesn't matter. You can't, you cannot work here. Maybe that would put you in a conflict that then would go up through the regulations. Maybe they should have handled it better. But they didn't. But they didn't do that. Maybe they should have handled it better from a business standpoint. But it doesn't change the fact. Medical standpoint. Medical standpoint. But it doesn't change the fact. No, no, no. I know it was a medical standpoint. The medical people did not say to him, you're out if you have narcolepsy. They clearly implied that you're not out because we don't accept the drug you're taking, but you change to Provigal or whatever it is. You change to the other drug and then come back and see us. And Prime apparently changed his mind. And Dr. Maldon did tell him directly, you have narcolepsy that's disqualifying. He's a medical doctor, and he said that. The bottom line here is that Prime chose. Excuse me. Yes. Can I ask you a question about the drug test? Yes. Has Prime gone back and fixed that drug test, or is it still a matter of record for this guy that he failed a drug test, even though, I mean, I'm just looking at the record evidence. There was a medical explanation. The MRO was supposed to code that test negative. Has Prime made any effort to fix that? I don't know. I don't know. And Prime doesn't have a legal obligation to do that because if he tested positive for amphetamines, the reason that Prime puts that out there is so that other trucking companies can consider that. Yes, Judge. The regs say it was supposed to be coded negative. The MRO was supposed to say negative. The regulations give the doctor the discretion to code it negative. I don't understand. The thing I'm reading says that the MRO must verify the test result is negative if there's a legitimate medical explanation. So what are you reading? And Part D says if you determine that there's a legitimate medical explanation, you must verify the test result is negative. Dr. Maldon apparently didn't determine that there was a legitimate medical explanation. And that's backed up by what the policy position is of the Federal Motor Safety Administration. The bottom line is this. The trucking company didn't want an over-the-road truck driver who had narcolepsy or who tested positive for amphetamines. Now, they may have handled it better, but that's the bottom line. They believed in safety in this instance. Thank you, Judge. Thank you very much. Ms. Fulmer, you have seven minutes if you want to take it. By the way, just let me ask, Mr. Belcher, you know, she filed a motion to consider this other information. For the record, do you oppose that? I don't know, Judge. I haven't read it. Okay. Fine. Fine. Okay. Just for the record, I haven't actually filed it yet. I've given it to you. I need to file it. Just filed it. I'll give it to us as filed. Great. That's wonderful. Your Honor, just a couple of points very quickly. This is a motion to dismiss. And there are numerous places in the orders, well, the report and recommendation itself and the orders of the district court that fail to construe the allegations of the complaint in the light most favorable to Mr. Lesoto. One in particular, and I really didn't notice this until I was preparing for argument, Joint Appendix, page 35. This is the magistrate judge's report and recommendation. It says, Mr. Lesoto received a phone call from Primes Medical Review Officer, MRO Dr. Malden, informing him that he was ineligible for hire because he had tested positive for amphetamines. That is absolutely not true, and that's not alleged in the complaint. Dr. Malden did one thing he was supposed to do, which was to contact the driver to find out if the driver wanted to discuss having a prescription for medication that had showed up positive. He did not say, you are not eligible for hire. That was not his role to do that. That's just one example, Your Honor. Judge Shedd, you were questioning about Dr. Abraham, the DOT physician who did the medical examination. He submitted a form and testified that he temporarily disqualified Mr. Lesoto until he could change his medications. So that was not actually a denial of a medical examiner's certificate like Your Honor suggests. It was, come back in six weeks and we'll see. Yeah, I know what you just said. I didn't suggest that there was sort of a matter that was ripe for the regulations on the conflict. Yes, sir. I didn't think that. When you read it, it's clear they're working through the situation to figure out. The guy comes in, your client comes in, he's got a note from his doctor explaining or he's telling them what's going to happen. He knows what's going to happen. He's not hiding anything. And they're working through the process of what to do in light of that information. And apparently this is done quite frequently as a matter of practice. Can I? Yes, Your Honor. Do you know the answer to Judge Harris's question as to whether this drug test is still on his record, a positive drug test? On his record means, as we understand it now, I've learned a lot since this was filed. You just have to answer the question. On his record means on the record called a DAC report. Is that information available? If I own a truck driving company and I want to hire your client, and I do run a search or something, does it show he has failed a drug test? Until four or five months ago, what was on the record was that Mr. Lisotto had violated company policy, and that was because he had tested positive. The drug screen results only stay on the DAC report for three years. But the other negative entries that Prime made, a company policy violation, not eligible for rehire, and a few other negative things remain on the DAC report. Now, I will say this, once we discovered that we could do this, we raised a dispute with HireRight, who actually is in charge of the DAC report, and HireRight undertook an investigation. They contacted Prime to say, do you disagree with removing this information from Mr. Lisotto's DAC report? Prime did not respond. Two points, two other quick points. The Spiker case that I've provided was actually a situation in which the driver himself suggested that the motor carrier should have pursued that administrative resolution procedure in 391.47, because the carrier's MRO had done some things that were wrong in the drug testing process. And in that case, the Federal Motor Carrier Safety Administration submitted a letter. When is your case, when is your case, when would this case, under your estimation, be ready for the conflict resolution provisions of 391? Never. Never. There's no current medical conflict. I said, when would it be? Never. Never. I mean, if, actually, after four years of not being able to find a job, our client fortunately was able to find one, and he's working, and so he doesn't need to go apply to Prime. But if he went to apply to Prime or to anybody else, he would undergo another medical evaluation. If there were a conflict in that evaluation, as intended by 391.47, between medical examiners, then he might have to use that procedure. If Prime had told him on the call back, when he called back in six weeks, we can't take you because you're narcoleptic, would that have then been a situation that could have gone up to 391? That would have been absolutely different. And I'll even go further and say this. If the MRO, who can, under the regs, as Mr. Belcher says, discover safety concerns of his own, he may contact the employer or the DOT physician and say, hey, I'm concerned about this. Will you look into this? But it's not up to the MRO. It's up to the DOT physician to decide about quality. So your position is, had Prime told your client you can't get the job because of some medical condition, that then you would have some way to challenge that maybe up through the 391? Yes, Your Honor. That's true. That's true. It's just your position is you are fighting the improper decision based on drug testing. Drug testing, yes, Your Honor, in the presence of a medication in his. Well, that's what I said, the improper result. Yes, Your Honor. And that's a whole different division. Am I right that those are two entirely different divisions of Department of Transportation, the people who handle the drug test stuff and whatever that is? The MROs and the verification process, that's a whole different. The 391 on qualifications is under the Federal Motor Carry Association's regulations that they promulgate, that they interpret, and that they apply. Those people would have no authority to construe these regulations under Chapter 40, Your Honor. Absolutely, and that's what the letter that we received and submitted in response to the judges. Do you know, are there truck drivers out there who have narcolepsy who are driving? Do you know? Is that in the record? Is it in the record? I don't recall any such events. But as Your Honor pointed, our fellow has sleep apnea, and he uses a CPAP machine. But I wasn't asking that question of you. I was just asking for my own edification traveling up and down the range. I just like to know. You're right. That would be kind of spooky, but I think there are. I'm not a doctor. I don't know about degrees. I don't know how it can be controlled with medication. Apparently, at the time of Mr. Lesoto's DOT physical, Dr. Abraham determined he could, but he had to change from the amphetamine to ProVigil. One other point. Just let me say this. Your time has expired.  Ten seconds. Jarvella, the case that prime relies upon for saying this is the employer's decision to make, has been vacated and superseded by Jarvella. The site for that is 776 Fed Third 822. Thank you very much. Thank you very much. We will step down, agree counsel, and then we'll go directly to the final case for the day.
judges: Dennis W. Shedd, Stephanie D. Thacker, Pamela A. Harris